IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| *Daito Kentaku USA, LLC*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:24-cv-01538 (AJT/LRV) |
| | ) | |
| *Comstock Partners, LC*, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In this contract action, Plaintiff Daito Kentaku USA, LLC ("Daito") brings three breach of contract claims and a request for a declaratory judgment against its business partner Comstock Partners, LC, and its affiliated business entities[1] (collectively, "Comstock") based on Comstock's allegedly improper dilution of Daito's ownership share in the parties' real estate joint venture under the parties' Limited Liability Company Agreement, as amended (the "LLC Agreement"). Comstock seeks a judicial declaration in its favor with respect to its rights under the LLC Agreement. [Doc. No. 20]. Pending are cross motions for summary judgment [Doc. Nos. 104, 110]. The Court held a hearing on the cross-motions on January 7, 2026, following which it took the motions under advisement. Upon consideration of the cross-motions, the memoranda in support thereof and in opposition thereto, the argument of counsel at the hearing and for the reasons stated herein, **both motions** are **GRANTED** in part and **DENIED** in part.

[1] The Defendants are Comstock Partners, LC ("CP"); Comstock Employee Ventures, LC ("CEV"); CRS RB4 Holdings, LC ("CRH"); and CP Management Services, LC ("CPM"). Of the four affiliated Defendants only CRH was a party to the LLC agreement. [Doc. No. 117] at 5; [Doc. No. 105-1]. However, this Order will refer to the Defendants collectively as Comstock unless a particular Defendant's identity is relevant.

## I. BACKGROUND

The parties, introduced by a broker in 2015, formed that same year a real estate joint venture ("the JV") to develop and manage a luxury apartment complex known as BLVD in Reston, Virginia ("BLVD" or "the Property").[2] [Doc. No. 105] at 11; [Doc. No. 105-1] at 4; [Doc. No. 117] at 5; [Doc. No. 81] ¶ 11. At all material times, Daito and CRH were the only members of the JV, with Daito the "investor member" and CRH the "administrative member." Each member contributed $35.5 million in initial funding and had a 50% ownership interest. [Doc. No. 105] at 12; [Doc. No. 105-1] at 1. The JV was and is governed by the LLC Agreement [Doc. No. 105-1], which was executed on June 17, 2015, with three amendments executed on August 1, 2016 [Doc. No. 105-2] (the First Amendment); January 21, 2019 [Doc. No. 105-21] (the Second Amendment); and an unspecified date in June 2020 [Doc. No. 105-64] (the Third Amendment).

Under Section 5.2(a) of the LLC agreement, the JV members are required to make additional capital contributions, subject to the approval of the "Management Committee," comprised of a representative appointed by each member. [Doc. No. 105-1] at 16; *see also* [Doc. No. 105] at 12–13; [Doc. No. 117] at 6. Eight such capital contribution calls were made through June 2018, each of which were evidently funded 50/50 by the members, since the parties maintained a 50-50 ownership interest before execution of the Second Amendment. [Doc. No. 132-15]; [Doc. No. 119] ¶ 6.

Section 5.2(d) of the LLC Agreement addresses what happens in the event that a JV member "fails or refuses" to pay its share of an additional capital contribution:

> In the event that a Member (the "<u>Non-Funding Member</u>") fails or refuses to fund its portion of any Additional Capital Contribution (following the expiration of the 30 day cure period), and the other Member (the "<u>Funding</u>

[2] Comstock had already begun construction on the building in 2014 when the JV was formed. [Doc. No. 117] at 3.

> Member") funds its portion of such Additional Capital Contribution, then the Funding Member shall have the option (but shall be under no obligation) to also fund the Non-Funding Member's portion of such Additional Capital Contribution. Any amount so funded by the Funding Member shall be treated as having been loaned on a non-recourse basis from the Funding Member to the Non-Funding Member, with an interest rate of 15% (an "Additional Equity Loan") and then contributed as an Additional Capital Contribution to the Company by the Non-Funding Member. Each Additional Equity Loan shall be due and payable within 18 months after the date such Additional Equity Loan is funded by the Funding Member. In the event that any Additional Equity Loan and any accrued and unpaid interest thereon is not paid in full by the Non-Funding Member…on or before the 18th month following the making of the Additional Equity Loan, then: [ the Non-Funding Member shall experience a 2x Dilution.]

[Doc. No. 105-1] at 17.

In late 2018, amid concerns that the JV would not meet its debt servicing requirements on the construction loan for the Property, Daito notified Comstock that it would be very difficult for it to fund its share of the anticipated capital contribution call, and at Daito's initiation, the parties in January 2019 negotiated the "Second Amendment" to the LLC Agreement.[3] [Doc. No. 117] at 9–10. Reflecting the Parties discussions[4] that prompted the Second Amendment are the following recitals, which are expressly incorporated into the Second Amendment:

> WHEREAS, in accordance with the Original Agreement, the Members have determined an Additional Capital Contribution will be required to among other items, satisfy the 2018 projected operating cash deficit and debt service coverage ratio financial covenants of the Loan (the "Loan Additional Capital Contribution"); [and]
>
> WHEREAS, the Investor Member has requested the Administrative Member fund the Loan Additional Capital Contribution and the Administrative Member has agreed to fund such Loan Additional Capital Contribution in accordance with the terms of the Original Agreement, as hereafter amended.

[Doc. No. 105-21] at 2.

---

[3] The Second Amendment was executed on January 21, 2019. [Doc. No. 117] at 9.

[4] *See, e.g.,* [Doc. No. 119-3] at 4–5 (Daito executives told Comstock in October 2018 that "we mean to propose and ask you if it would be feasible for…Comstock [to] make up for the bank loan shortall in the Reston BLVD project"); [Doc. No. 119-3] at 2 (in November 2018 Daito tells Comstock that "we do not at all intend to stick to maintain [sic] our capital contribution ratio.")

The Second Amendment added a new provision, Section 5.2(e), which addresses what happens if, as anticipated, Daito "fails or refuses" to pay its share of the Loan Additional Capital Contribution (the "LACC"), defined specifically in the Recitals as the Additional Capital Contribution needed to cover the upcoming 2018 construction loan servicing payment:

> In the event that a Non-Funding Member fails or refuses to fund its portion of a Loan Additional Capital Contribution, and the Funding Member funds its portion of a Loan Additional Capital Contribution, then the Funding Member shall fund the Non-Funding Member's portion of the Loan Additional Capital Contribution. Any amount so funded by the Funding Member shall be treated as having been loaned on a non-recourse basis from the Funding Member to the Non-Funding Member (a "Member Additional Equity Loan"), then contributed as an Additional Capital Contribution to the Company by the Non-Funding Member."

[Doc. No. 105-21] at 3.

Section 5.2(e) further provides that "[t]he Loan Additional Capital Contribution, **when made**, shall result" (emphasis added) in a 1x dilution to the Non-Funding Member. *Id.* Absent from Section 5.2(e) is any opportunity for the Non-Funding Member to avoid the 1x dilution after the Loan Additional Capital Contribution has been made, either by way of the 30 day cure period or the payment of its share within 18 months referenced in Section 5.2(d).

Daito as the Investor Member was also subject to further dilution under Section 15.20, also added in the Second Amendment. In effect, Section 15.20[5] required Daito to fund certain a "New Investment" or face additional dilution. Specifically, Section 15.20(a) provides that if Daito "fails to execute a binding financial commitment and fund an investment of Forty Million

[5] Specifically, section 15.20(a) provides in relevant part:

> In the event the Investor Member [Daito] fails to execute a binding financial commitment and fund an investment of Forty Million Dollars ($40,000,000) or more (the "New Investment") on stabilized asset(s) through Administrative Member [CRH] or its affiliates or commonly controlled entities, by September 30, 2019, [Daito's ownership interest will be diluted 1.5x].

[Doc. No. 105-21] at 5.

Dollars ($40,000,000) or more (the '<u>New Investment</u>') on stabilized asset(s) through [Comstock] by September 30, 2019," it would experience a further 1.5x Dilution. *Id.* at 5. Under Section 15.20(b), Daito would experience an additional 2x, rather than 1.5x, dilution if (1) it failed to make the "New Investment," defined under Section 15.20(a); (2) Comstock had "met its Business Plan and Budget" for 2019, and "any additional investment opportunity(ies) presented to the Investor Member by [Comstock] reasonably projects a five percent (5%) yield…if the opportunity is for stabilized assets;" and (3) there is no "finding of fact so material and detrimental that it would prevent a ordinary and reasonable institutional or corporate investor from proceeding with an investment." *Id*. at 6.

The Second Amendment also amended Sections 6.2(a)[6] to reference Section 5.2(e) and 9.2(a)[7] to authorize Comstock to appoint a third representative to the Management Committee if

---

[6] Section 1(c). of the Second Amendment provides in relevant part:

> Section 6.2 of the Original Agreement is hereby deleted in its entirety, and replaced with the following language:
>
> 6.2 <u>Distributions Following a Default Under Additional Equity Loan</u>. If either Member makes a Member Additional Equity Loan and the other Member defaults after the same becomes due and payable in accordance with <u>Section 5.2(d),</u> then except as provided in <u>Sections 5.2(e). 6.3., or 13.3,</u> Distributable Funds shall be distributed to the Members within 15 days of the end of each calendar quarter in the following order and priority:
>
> (a) First, to the Funding Member until the Funding Member has received, on a cumulative basis under this Section 6.2(a), a return of all of its Additional Capital Contributions made as a result of any Member Additional Equity Loans or Additional Equity Loans hereunder;
>
> (b) Second, to the Members pro rata and part passu in accordance with their respective unreturned Additional Capital Contributions, until each Member has received, on a cumulative basis under this Section 6.2(b), a return of all of its Additional Capital Contributions made hereunder; provided, however, that for so long as any Member Additional Equity Loans or Additional Equity Loan remain outstanding, any amount that would otherwise be distributed to a Non-Funding Member pursuant to this Section 6.2(b) shall be distributed on such Non-Funding Member's behalf to the Funding Member and applied to the repayment of such Member Additional Equity Loans or Additional Equity Loan (first to unpaid accrued interest and then to principal);
>
> […]

[Doc. No. 105-21] at 4.

[7] Section 1(d). of the Second Amendment provides:

> Section 9.2(a) of the Original Agreement is hereby amended by adding the following paragraph in its entirety with the following language:
>
> In the event that an Investor Member fails or refuses to fund its portion of a Loan Additional Capital Contribution and the Administrative Member funds its portion of a Loan Additional

Comstock funded Daito's share of the Loan Additional Capital Contribution referenced in Section 5.2(e) and the Management Committee thereafter to make decisions by majority vote.

On April 9, 2019, CRH executed a loan modification agreement with the Bank [Doc. No. 119-9], pursuant to which Comstock paid $20.5 million to the Bank that same day, without any contribution from Daito. [Doc. No. 118-11] at 78; [Doc. No. 105] at 20–21. At this point, Comstock considered the Loan Additional Capital Contribution in Section 5.2(e) paid and on that basis diluted Ownership share 1x to 40% pursuant to Section 5.2(e) (the "First Dilution"). [Doc. No. 119] ¶ 7.

The present controversy issues centrally out of the events that followed CRH's execution of the loan modification agreement and its $20.5 million payment on April 9, 2019. In that regard, on April 19, 2019, despite Daito's earlier statements and requests, as memorialized in the Second Amendment, Daito's Board approved a $10 million payment to Comstock for its share of the $20.5 million Comstock paid to the Bank on April 9, 2019.[8] [Doc. No. 105] at 21; [Doc. No. 105-4] at 80–81; [Doc. No. 105-29] at 125. In May 2019, Daito executives traveled to Virginia to meet with Comstock executives, at which time Daito's $10 million payment was discussed and

---

> Capital Contribution and then the Administrative Member funds the Investor Member's portion of the Loan Additional Capital Contribution:
> The Management Committee thereafter shall consist of three individuals appointed to act as "representatives" of the Person that appointed him or her (the "Representatives") as follows: (i) Investor Member [Daito] shall be entitled to designate one Representative to represent Investor Member; and (ii) Administrative Member [Comstock] shall be entitled to designate two Representatives to represent Administrative Member. A majority vote of the Representatives appointed to the Management Committee shall constitute the approval of the Management Committee for the purposes hereof."

[Doc. No. 105-21] at 5.

[8] Daito contends that it approved a $10 million contribution toward the $20.5 million Bank payment, rather than $10.25 million, because Comstock had not yet provided Daito with a copy of the loan modification agreement as of the Board vote, and that Comstock did not inform it of the precise capital call amount until after the April 19 board approval. *See* [Doc. No. 105] at 21. In any event, Comstock does not rely on the $250,000 difference in connection with any of its positions.

rejected by Comstock.[9] [Doc. No. 105] at 22; [Doc. No. 105-4] at 77–83; [Doc. Nos. 105-36, 105-37, 105-38].

Despite Comstock's refusal to accept Daito's $10 million contribution, the parties continued negotiations over whether and on what terms Comstock would accept Daito's $10 million contribution and/or restore Daito's 50-50 ownership, which centered on Daito's $40 million funding obligation in New Investments as set forth in Section 15.20(a) of the Second Amendment. Towards that end, between May and September of 2019, Comstock sent to Daito numerous properties for Daito to invest in, but the parties never resolved their disagreements regarding the starting point for their negotiations. Specifically, Comstock contended that under the already executed Second Amendment, pursuant to which Comstock made the $20.5 million Loan Additional Capital Contribution to the Bank on April 9, 2019, Daito had already become diluted 1x pursuant to Section 5.2(e) and was already under an obligation to make the $40 million investment commitment or face additional 1.5x or 2x dilution under Section 15.20 (a) and (b), and the parties were now simply negotiating a new, separate agreement to restore Daito to 50-50 ownership. [Doc. No. 117] at 14; [Doc. No. 119-19]. Daito, on the other hand, contended that although it had "accept[ed] as a 'temporary matter' the dilution to 40%" under Section 5.2(e) and it was willing to make the $40 million commitment under Section 15.20 of the Second Amendment, Comstock was required to accept its $10 million share of the $20.5 million Loan Additional Capital Contribution Comstock paid to the Bank, reverse the First (1x) Dilution to 40% and restore Daito to its 50% ownership interest in the JV. [Doc. No. 105] at 23–24; [Doc. No. 105-4] at 91, 93. In any event, the parties never reached an agreement on these issues and

[9] Daito contends that at that time it made a formal offer of payment that was refused by Comstock, [Doc. No. 105] at 22–23; Comstock contends that discussions about the payment were merely informal but concedes that it "expressly rejected Daito's contribution." [Doc. No. 105-3] at 98; [Doc. No. 117] at 13; [Doc. No. 112-10] at 2.

beginning on September 30, 2019, Comstock, as the JV's Administrative Member, further diluted Daito's ownership from 40% to 29.6% based on a "2x dilution" pursuant to Section 15.20(b) (the "Second Dilution") [Doc. No. 119] ¶ 11. Since the Second Dilution, Comstock has made no distributions to Daito in reliance on Section 5.2(e) and Section 6.2(a) of the Second Amendment. [Doc. No. 105] at 26; [Doc. No. 117] at 19–20.

Daito filed this action on August 30, 2024.[10]

## II. LEGAL STANDARD

The standard for granting summary judgment is satisfied if, after a review of the record, the Court finds that there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Whether a fact is material depends on the relevant substantive law, and there are no material facts in dispute "unless there is sufficient evidence favoring the nonmoving party." *Anderson*, 477 U.S. at 248–49. Sufficiency of the nonmoving party's evidence is evaluated by whether a reasonable juror could find in their favor by a preponderance of the evidence; thus, "the mere existence of a scintilla of evidence in support of the [party's] position will be insufficient." *Id*. at 252. And while the Court must resolve conflicting inferences from circumstantial evidence in favor of the nonmoving party, the review standard does not allow for the distortion of "the plain meaning of words or [to] conveniently . . . read them out of context." *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 821–22 (4th Cir. 1995). When evaluating cross-motions for summary judgment, the Court should "rule upon each party's motion separately and determine whether summary

[10] Comstock filed its Answer to the Complaint and Counterclaim on October 8, 2024 [Doc. No. 20]; the Counterclaim was amended with leave of the Court on April 11, 2025. [Doc. No. 52]. On June 18, 2025, Daito filed its Amended Complaint [Doc. No. 77] and Comstock filed its Answer to the Amended Complaint on July 2, 2025. [Doc. No. 81]. Discovery concluded on October 17, 2025, and on November 21, 2025, the parties filed the cross Motions for Summary Judgment, which were fully briefed on December 18, 2025. The Court held a summary judgment hearing on January 7, 2026, after which it took the Motions under advisement.

judgment is appropriate as to each under the [Federal Rule of Civil Procedure] 56 standard." *Norfolk S. Ry Co. v. City Of Alexandria*, 608 F.3d 150, 156 (4th Cir. 2010) (quoting *Monumental Paving & Excavating, Inc. v. Pa. Mfrs.' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999)).

## III. DISCUSSION

Daito contends that (1) the First Dilution based on Comstock's Bank payment on April 9, 2019 was improper since as of April 9, 2019, Daito had not "failed or refused to fund" its portion of the Ninth Capital Call, which Comstock did not present to Daito until mid-May, 2019, at which time it properly tendered its share of the $20.5 million to Comstock, which Comstock wrongly rejected in breach of Section 5.2(e) as well as Daito's cure and repayment rights under Section 5.2(d); and (2) Daito has not defaulted on its $40 million funding obligation under Section 15.20, and no dilution was therefore authorized under either Section 5.2(e) or Section 15.20. [Doc. No. 77] ("[Am. Compl.]") ¶¶ 44, 52-65.[11] It also contends that since it did not "default" as to any obligation under either Section 5.2(d) or (e), Comstock has improperly ceased distributions to it under Section 6.2(a). For its part, Comstock contends (1) that any challenge to the First Dilution under Section 5.2(e) is time barred by the running of the applicable five year limitations period for breach of a written contract; (2) in any event, the First Dilution was proper under Section 5.2(e), both by its terms and also because the cure and repayment provisions of

[11] Daito's challenge to the First Dilution appears to have evolved during the litigation. In Counts I and II, both in its original and Amended Complaint, Daito did not directly challenge the First Dilution pursuant to Section 5.2(e), only the Second Dilution, [Doc. No. 1] ¶ 33; [Am. Compl.] ¶ 51. Rather, the initial complaint states that "[t]he Second Amendment exempted Daito from making its proportionate share of the additional capital contribution of $20 Million *without any impact on Daito's Percentage Interest unless and until (i) Daito failed to complete the New Investment…"* [Doc. No. 1] ¶ 26 (emphasis added). However, in Counts III and IV, which were added in Daito's Amended Complaint, Daito at least implicitly challenges the First Dilution with its allegations that Comstock's refusal to accept the $10 million from Daito breached sections 5.2(d) and 9.1(a) of the LLC Agreement on grounds, *inter alia*, that Daito "had the contractual right to 'return to 1-1 voting rights'" under section 5.2(d) "by paying its share of the capital contribution within 18 months of May 8, 2019 or whatever date the capital contribution was funded by Comstock," and that Comstock's imposition of conditions to that restoration under Section 15.20 violated its obligation under the standard of care to manage the JV in the best interests of the BLVD property. [Am. Compl.] ¶ 54; [Doc. No. 105] at 35 ("Dilution of Daito to 40%...violated the LLC Agreement."); *Id.* at 36 ("[T]he second amendment should never have applied at all.").

Section 5.2(d) did not apply to Comstock's Loan Additional Capital Contribution under Section 5.2(e); (3) the Second (2x) Dilution was proper under Section 15.20(b), or at a minimum, a 1.5x dilution is proper under Section 12.20(a),[12] [Doc. No. 20]; and (4) the "deadlock" provision in Section 12.3(a) that Daito has threatened to invoke, authorizing the forcing of a buy-sell election when "the members of the Management Committee are unable to agree," cannot be triggered given that the current three person Management Committee can make decisions by majority vote. [Doc. No. 52] ¶¶ 52-73.

A. Daito's Challenge to the First (1x) Dilution under Section 5.2(e) Is Time-Barred (Counts III, IV)[13]

Under Virginia law, the statute of limitations for a breach of a written contract claim is five years, which runs from the date "when the breach of contract occurs," *not* when the damages is sustained or the aggrieved party becomes aware of the damage. *E. W., LLC v. Rahman,* 896 F. Supp. 2d 488, 511 (E.D. Va. 2012) (quoting Va. Code Ann. §§ 8.01–246(2), 8.01–230); *see also Kerns v. Wells Fargo Bank, N.A.*, 818 S.E.2d 779, 783 (Va. 2018).

Section 5.2(e) unambiguously states that "The Loan Additional Capital, **when made**, **shall result**" in the 1x Dilution, and that it is "made" when "a Non-Funding Member fails or refuses to fund its portion of a Loan Additional Capital Contribution, and the Funding Member funds its portion of a Loan Additional Capital Contribution." [Doc. No. 105-21] at 3. It is undisputed that on April 9, 2019, Comstock executed on a loan modification agreement with the Bank, [Doc. No. 119-9], and paid the full Ninth Capital Call of $20.5 million to the Bank that

[12] Three Comstock Defendants (CP, CEV, and CPM) have also filed a motion to dismiss for failure to state a claim, arguing that only CRH was a party to the Second Amendment, and as such their rights were not affected by any determination of Daito's and CRH's respective ownership shares. [Doc. No. 17]. On November 8, 2024, the Court denied the Motion to Dismiss. [Doc. No. 32].

[13] Given the Court's ruling based on the statute of limitations, the Court need not consider the merits of the parties' respective positions with respect to Daito's claims based on Sections 5.2(d) and (e).

same day, without any contribution from Daito, thus “making” the Loan Additional Capital Contribution including Daito’s portion. [Doc. No. 118-11] at 78; Doc. No. 105] at 20–21. Under Section 5.2(e), this action automatically triggered the 1x dilution and clearly constituted the alleged breach which initiated the statute of limitations period.[14] [Doc. No. 119] ¶ 7. Daito did not commence this action until August 30, 2024, over four months after the limitations period expired.[15] Similarly, even if the breach were viewed as occurring upon Comstock’s rejection of Daito’s purported tender at the May 2019 meeting, Daito’s breach of contract claim would also be outside the five year limitations period.

Daito contends that because the parties continued to negotiate over issues including the restoration of 1-1 voting rights, and because Comstock unreasonably continued to insist that Daito invest well in excess of its $40 million obligation to achieve such restoration, these actions either also constitutes separate breaches of the JV agreement or tolled the running of the applicable statute of limitations. [Doc. No. 139] at 35-36 (citing *Drummond Coal Sales, Inc. v. Norfolk S. Ry. Co.*, 3 F.4th 605, 610 (4th Cir. 2021) (affirming that each allegedly unlawful fee applied by the defendant constituted a discrete and separate breach of contract)). But Daito points to nothing in connection with those negotiations that would constitute a discrete breach of Section 5.2(d) or (e) and Daito makes no claim that it does.

Nor does Comstock’s conduct after May, 2019 constitute a “continuing violation” which would justify tolling the statute of limitations. Under Virginia law, “a continuing violation is

[14] This conclusion is consistent with Daito’s own understanding of when the breach occurred as reflected in the declaration of one of its executives that it considers Daito’s ownership share in the JV to have been diluted 1x to 40% pursuant to Section 5.2(e) when Comstock’s Bank payment was made on April 9, although regardless of either party’s understanding the terms of the Second Amendment unambiguously establish that the First Dilution occurred upon payment to the bank.

[15] The record also shows that Daito acknowledged Comstock’s payment to the Bank in an email dated April 23, 2019, referring to it as a capital contribution, [Doc. No. 119-10] at 3–4, and therefore even if the claim were deemed to have accrued when Daito became aware of the breach, it would still be time-barred.

occasioned by continual unlawful acts, not continual ill effects from an original violation." *Commonwealth ex rel. Fair Hous. Bd. v. Windsor Plaza Condo. Ass'n*, 768 S.E.2d 79, 94 (Va. 2014) (quoting *Moseke v. Miller & Smith, Inc.*, 202 F. Supp. 2d 492, 495 (E.D. Va. 2002) (cleaned up)). Here, Comstock's actions following the First Dilution in April, 2019 and its refusal to accept Daito's offers of lump-sum repayment of the LACC in May, 2019, principally its refusal to undo the First Dilution, was not part of any alleged breach that occurred either in April, when the bank payment was made or May, when the alleged improper rejection of Daito's tender took place. Rather, it represented, at most, the "ill effects" of those alleged breaches.

For all these reasons, Daito's challenge to the First Dilution is time-barred.

B. Comstock's cessation of distributions to Daito was proper (Count III) [16]

Daito contends in Count III that Comstock improperly withheld Daito's share of distributions from the BLVD property following the Second Dilution on September 30, 2019 in violation of Section 6.2(a) since it was never in "default" under Section 5.2(d) or, given its tender of its share of the $20.5 million Bank payment, under Section 5.2(e). [Am. Compl.] ¶¶ 31, 57. Comstock contends that distributions were properly withheld pursuant to Sections 5.2(e) and 6.2(a) of the LLC agreement as amended in the Second Amendment, which, when read together, according to Comstock, authorizes Comstock to withhold all distributions to Daito until it has recouped Daito's share of the 20.5 million Bank payment, contributed by Comstock pursuant to Section 5.2(e), i.e. $10.25 million. [Doc. No. 117] at 26–27. Given the Court's ruling dismissing Daito's challenge to the First Dilution, the only issue is whether that First Dilution authorized the challenged withholding of distributions to Daito.

[16] Because Daito's breach of contract claim based on Comstock's withholding of distributions involves allegations of a separate and discrete breach with each instance of withholding a distribution and involves withholdings that began after the Second Dilution was imposed following Daito's failure to make a New Investment by September 30, 2019, Daito's breach of contract claim based on the withholding of distributions is within the 5 year limitations period.

Section 6.2, set forth in the Second Amendment provides in relevant as follows:

> 6.2 Distributions Following a Default Under Additional Equity Loan. If either Member makes a Member Additional Equity Loan and the other Member defaults after the same becomes due and payable in accordance with <u>Section 5.2(d),</u> then except as provided in <u>Sections 5.2(e). 6.3., or 13.3,</u> Distributable Funds shall be distributed to the Members within 15 days of the end of each calendar quarter in the following order and priority:
>
> (a) First, to the Funding Member until the Funding Member has received, on a cumulative basis under this Section 6.2(a), a return of all of its Additional Capital Contributions made as a result of any Member Additional Equity Loans or Additional Equity Loans hereunder.

[Doc. No. 105-21] at 4.

Daito contends that since it never "defaulted" under Section 5.2(d) (which Comstock agrees with), Comstock's withholding of distributions under Section 6.2 is improper. But dispositive of this issue is that Section 6.2(a) makes a "default" under Section 5.2(d) a condition for withholding distributions "except as provided in Section[] 5.2(e)." [Doc. No. 105-21] at 4. Section 5.2(e) states, in pertinent part, that upon payment of the Loan Additional Capital Contribution, distributions shall be made in accordance with Section 6.2(a). *Id*. at 3. That distribution scheme requires, in relevant part, that distributions be made "[f]irst, to the Funding Member [Comstock] until the Funding Member has received, on a cumulative basis under this <u>Section 6.2(a)</u>, a return of all of its Additional Capital Contributions made as a result of any Member Additional Equity Loans or Additional Equity Loans hereunder." *Id.* at 4. Comstock's Loan Additional Capital Contribution constitutes for the purposes of Section 6.2's distribution scheme both an Additional Capital Contribution and a Member Additional Equity Loan.[17] As a result, once Comstock made the $20.5 million Bank payment pursuant to Section 5.2(e), it was

[17] As stated in the Recitals, the Loan Additional Capital Contribution is the name given to the specifically identified Additional Capital Contribution. *See* [Doc. No. 105-21] at 2–3 ("Additional Capital Contribution will be required to among other items, satisfy the 2018 projected operating cash deficit and debt service coverage ratio financial covenants of the Loan (the 'Loan Additional Capital Contribution"');" and under Section 5.2(e), "[a]ny amount so funded by the Funding Member shall be treated as having been loaned on a non-recourse basis from the Funding Member to the Non-Funding Member (a '<u>Member Additional Equity Loan</u>'), and then contributed as an Additional Capital Contribution to the Company by the Non-Funding Member."

entitled to recoup Daito's share automatically through distributions. For these reasons, Comstock's withholding of distributions to Daito is proper. [18]

C. The Second Dilution under Section 15.20 was improper under Section 15.20(b) but authorized under Section 15.20(a) (Counts I and II)

Both parties seek a declaration concerning their respective ownership interest under Section 15.20. Daito contends that Comstock's 2x dilution was not proper under Section 15.20(b) because Comstock failed to meet the 2019 Business Plan and Budget, as required, or present qualifying "stabilized assets" and its alternative request to approve a 1.5x dilution under section 15.20(b) is not authorized because Comstock failed to present any "stabilized assets" in which it could have invested the required $40 million. Comstock's seeks a declaration that under section 15.20(b), Daito's ownership interest in the JV was properly diluted by 2x to 29.6% or, alternatively, at a minimum, a 1.5x dilution to 34.7% is authorized because Daito failed to execute a written commitment and fund one of the stabilized assets that Comstock presented to it by September 30, 2019. [Doc. No. 52] ¶¶ 52-57; [Doc. No. 117] at 22–25.

(1) *The Second (2x) dilution Comstock actually imposed was improper* (Count I)

Comstock imposed a 2x Dilution based on what it regarded as Daito's failure to provide the $40 million investment commitment and Comstock's satisfying on its part all conditions precedent to such a dilution. Daito contends that regardless of whether it provided the required $40 million investment, Comstock failed to satisfy the conditions precedent to imposing a 2X dilution, specifically, meeting all the requirements of the 2019 BLVD Business Plan and Budget, as required for a 2x dilution under section 15.20(b). In that regard, Daito claims that Comstock

[18] Daito's position also appears to be, in substance, at least in part, that Comstock breached the terms of the LLC Agreement as amended by insisting on repayment of its share of the $20.5 million Bank payment through distributions only, and not by accepting the lump sum payment that Daito tendered, but nothing in Sections 5.2(e), 6.2(a), or elsewhere in the LLC Agreement, required Comstock to accept Daito's tender in substitution for its distribution rights under Section 6.2.

failed to meet several benchmarks in BLVD's 2019 and 2020 business plans that it has characterized as "must meet," including occupancy percentage (93.40% (must meet) vs. 85.5% (actual)); leased percentage (94.70% (must meet) vs. 87.50% (actual)); and average monthly rent ($2,199 (must meet) vs. $2,189 (actual)). *See* [Doc. No. 105] at 37–39; [Doc. No. 132-19]; [Doc. No. 132-58]. Daito also contends that Comstock failed to meet the Net Operating Income ("NOI") target and that Comstock's contention otherwise is based on its improperly inflating the actual NOI with various amounts, as confirmed by the audited financial statement prepared by the JV's outside certified public accountants. *See* [Doc. No. 105] at 37–39; [Doc. No. 132-57] at 6.

Comstock does not dispute that it failed to meet the non-NOI targets in the 2019 Business Plan and Budget but contends that "there was no requirement that [Comstock] meet all the metrics in the 2019 Business Plan and Budget or that occupancy rate, targeted leases, and average rent were material benchmarks." [Doc. No. 144] at 33. Rather, it contends that the NOI was the "controlling metric" for purposes of section 15.20(b), which was met, as reflected in statements by Daito's own damages expert. *Id.* at 31, 33.

Section 15.20(b) allows 2x dilution only if "the Administrative Member has [] met the *Business Plan and Budget* for 2019…" [Doc. No. 105-21] at 6 (emphasis added). The issue then is what constitutes "meeting" the "*Business Plan and Budget*"?

The 2019 Business Plan and Budget adopted under Section 9.3 of the LLC Agreement consists of numerous charts listing targeted metrics on both the business plan side and the budget side; and Section 15.20(b)'s reference to *both* the business plan *and* budget required Comstock to meet the targeted levels identified in both the business plan and the budget. This language clearly references the business plan and budget in its entirety without reference to any particular

component of that Business Plan and Budget as controlling, dispositive, or more important than any other metric in the business plan. Comstock concedes it did not meet numerous targeted metrics and as a result, regardless of whether Comstock met the NOI target,[19] Comstock failed to satisfy all the required conditions precedent for 2x dilution under section 15.20(b), and Daito is entitled to summary judgment on Count I with respect to Comstock's Second Dilution.[20]

(2) *A 1.5 X Dilution under Section 15.20(a) is authorized* (Count II)

Because Comstock did not meet the conditions to dilute Daito's share by 2x, the only remaining issue with respect to the parties' ownership interests is whether a 1.5x dilution is proper under Section 15.20(a), such that Daito's share should be 34.7% rather than 40%.[21] Section 15.20(a) provides for 1.5x dilution (to 34.7%; *see* [Doc. No. 52] ¶¶ 52-57) if Daito "fails to execute a binding financial commitment and fund an investment of Forty Million Dollars ($40,000,000) or more (the "New Investment") on stabilized asset(s) through Administrative Member [CRH] or its affiliates or commonly controlled entities, by September 30, 2019." [Doc. No. 105-21] at 5–7. It is undisputed that Daito did not "execute a binding commitment and fund" a $40 million in a "New Investment" by September 30, 2019. Nevertheless, Daito contends that Comstock never presented the "stabilized assets" for it to invest in but rather attempted a bad-faith renegotiation of Section 15.20 by insisting on an investment by Daito in the hundreds of

[19] There is no doubt a substantial question whether for the purposes of Section 15.20(b), Comstock met the NOI set forth in the Business Plan and Budget, given the JV's 2019 audited financial statement which calculated the 2019 NOI to be less than the NOI listed in the 2019 Business Plan and Budget. *Compare* [Doc. No. 132-19] at 30 *with* [Doc. No. 132-57] at 6.

[20] To the extent there is any ambiguity with respect to what was required in order to "meet" the 2019 Business Plan and Budget, the record reflects that Comstock's understanding of that requirement included meeting not just the NOI. *See* [Doc. No. 132-20] (Exhibit O (under seal), an email dated March 25, 2019, between Comstock employees preparing the "budget slides" that clearly reflects the understanding that items other than the NOI, such as occupancy rates and rent averages, were items that the parties would "commit" to).

[21] Daito argues that Comstock did not apply 1.5x dilution and is not entitled to retroactively seek declaratory relief "in the alternative." [Doc. No. 139] at 30. Given the on-going controversy concerning the parties' respective ownership interests, the Court finds this argument unpersuasive.

millions of dollars, well in excess of the $40 million investment contemplated in Section 15.20(a). [Doc. No. 139] at 27-28.

It is undisputed that on multiple occasions, Comstock sent Daito information on numerous properties with values well in excess of $40M. *See, e.g.* [Doc. No. 119-17]. Specifically, on June 4, 2019, CRH sent a proposal to Daito identifying numerous acquisition candidates, with five multifamily properties and four office buildings, [Doc. No. 119-17]; and on July 10, 2019, Comstock sent executive summaries of the Atley and Hartford properties, as well as an Investor Relations presentation that identified five other potential multifamily acquisition targets and four other potential office acquisition targets, [Doc. Nos. 120-1, 120-2]. It also undisputed that the parties discussed several of these properties in more depth, with Daito expressing at least a preliminary interest in the Hartford and the Atley projects. [Doc No. 117] at 16; [Doc. Nos. 120-4, 120-5, 120-6]; [Doc. No. 139] at 18. Nevertheless, Daito did not commit to investing in any of the properties proposed by Comstock or otherwise make the $40 million binding commitment contemplated in Section 15.20 by September 30, 2019. [Doc. No. 117] at 17.[22] The issue then is whether any of these properties proposed by Comstock constituted "stabilized assets" that Daito could have invested in and thereby satisfy its funding obligation.

The term "stabilized assets" is not defined in either the Second Amendment or the LLC Agreement; but dispositive of this issue is the testimony of Kazuki Morioka, Daito's Rule 30(b)(6) designated representative who testified that "stabilized assets" simply means "existing properties." [Doc. No. 118-13] at 49; *see also NewMarket Corp. v. Innospec Inc.*, No. 3:10-CV-

---

[22] Daito contends that "[n]o properties other than Hartford and Atley are put forward by Comstock as satisfying the 'New Investment' criteria under the Second Amendment." [Doc. No. 139] at 28. But that position is inconsistent with the undisputed evidence concerning properties that Comstock presented other than the Atley and Hartford Building. *See* [Doc. No. 120-2] at 13 (Loudon Station stabilized 2014); *Id*. at 44 (2941 Fairview Park 94% leased); *Id*. at 46 (John Marshall II 100% leased).

503, 2011 WL 1306008, at *5 (E.D. Va. Apr. 1, 2011) ("At the Rule 30(b)(6) deposition, the corporate designee speaks for the corporation and gives binding answers for the corporation." (quoting *Humanscale Corp. v. CompX Int'l Inc.,* No. 3:09cv86, 2009 WL 5091648, at *2 (E.D. Va. Dec. 24, 2009) (cleaned up))).[23]

With respect to Daito's bad faith negotiations contention, Daito concedes that "[f]rom June 2019 *until January 2023*, Comstock continued to send proposals" but contends that each of these investor presentations "included a requirement to invest hundreds of millions of dollars," far in excess of the $40 million contemplated by Section 15.20. [Doc. No. 105] at 23. However, neither the investment proposals themselves [Doc. Nos. 132-39, 132-40, 132-41] nor Daito's relied-upon deposition testimony by executives from Daito and Comstock establishes that Comstock attempted to unilaterally raise the investment requirement in Section 15.20. Rather, the goal of those negotiations was to restore Daito to 50-50 voting rights, *see* [Doc. No. 132-38] at 2; [Doc. No. 139] at 35-36, not merely to fulfil its existing $40 million obligation under Section 15.20, which does not provide for a restoration of voting rights; and the record shows that while *both parties* understood that these negotiations, if successful, would supersede or satisfy Daito's obligation under Section 15.20, Daito has not presented any evidence that Comstock imposed the establishment of such an investment fund in excess of $40 million as a requirement under Section 15.20(a) and Comstock continued to leave open the opportunity for Daito to satisfy its commitment under Section 15.20(a) through the more limited $40 million

[23] Daito also contends that because the Atley "was not within Comstock's control," it was "not qualifying under Section 15.20," [Doc. No. 139] at 18, 28, effectively asserting (again without support in the Second Amendment) that Comstock was only permitted to present properties that it already owned. As to the Hartford, the 5% yield requirement is in section 15.20(b), not (a), and as to the Atley, the record shows that the parties jointly pursued acquisition of that property until *Daito* decided to give up that pursuit either before or simultaneously with their being outbid on that property. [Doc. No. 139] at 18.

investment, as evidenced by the negotiations around the Hartford and Atley buildings after Daito expressed interest in those.

In sum, the record shows no material dispute of fact as to the following: (1) that upon execution of the Second Amendment Daito undertook an obligation to invest $40 million in stabilized assets presented by Comstock or its affiliates, (2) that Comstock presented it with "stabilized assets," and (3) that Daito did not timely make the required written commitment or investment by September 30, 2019.[24] The Court therefore concludes as a matter of law that under Section 15.20(a) Daito's dilution by 1.5x to 34.7% is authorized under Section 15.20(a).

D. The Second Amendment did not eliminate Daito's right to trigger a buy-sell election under Section 12.3(a) (Count II of the Amended Counterclaim)

Section 12.3 of the LLC Agreement, titled "Deadlock, contains Section 12.3(a), which states:

> In the event that members of the Management Committee are unable to agree upon any Major Decision or any other matter for which they have decision making authority in this Agreement, at any time after the earlier of (i) the fourth anniversary of the date hereof and (ii) two years after Completion of the Project, either Member shall have the right to initiate a buy-sell election as set forth below. No such buy-sell election may be initiated prior to the occurrence of either of the foregoing (i) or (ii).

[Doc. No. 52] at 11–12; [Doc. No. 105-1] at 39. Comstock contends that during negotiations Daito has threatened to invoke its rights under Section 12.3(a) to initiate a buy-sell election, in light of which Comstock seeks a declaratory judgment that Daito no longer has the contractual right to "initiate a buy-sell election" under Section 12.3(a).[25] In that regard, Comstock contends

---

[24] Nor is there any evidence in the record that Daito sought an extension of the September 30, 2019 deadline to make its investment.

[25] Section 9.2(a), as amended by the Second Amendment, authorized Comstock, upon its covering Daito's share of the $20.5 million Bank payment, to appoint a second representative to the previously two-member Management Committee, thus granting it a majority, and according to Comstock, control over all decisions affected the JV. [Doc. No. 105-21] at 5.

that given the current composition of the Management Committee and that it now has voting control of the three person Management Committee, a "deadlock" is an impossibility since the "members of the Management Committee" are not "unable to agree upon any Major Decision or any other matter for which they have decision making authority." [Doc. No. 140] at 16–17. Daito contends that it retains the right to trigger the deadlock provision pursuant to Section 12.3, notwithstanding the current composition of the Management Committee and its ability to make decisions by a majority vote. The Court agrees in substance with Daito's position. [26]

"The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." *W. F. Magann Corp. v. Virginia-Carolina Elec. Works, Inc.*, 123 S.E.2d 377, 381 (Va. 1962). Section 12.3(a) appears to differentiate between the phrase "members of the Committee" with "members" uncapitalized and undefined in the LLC Agreement, and "Member," capitalized and defined as Members of the JV, *viz,* Daito and Comstock. *See* [Doc. No. 105-1] at 11 ("'Member' and 'Members' shall means [sic] Investor Member, Administrative Member and any other Person admitted to the Company pursuant to this Agreement."). The issue then reduces to whether majority control by Comstock of the three person Management eliminates Daito's rights to initiate the buy-sell election in the event that the "members of the Management Committee are unable to agree," such that "either Member" may initiate a but sell-election.

[26] Daito argues that the "members" referenced in the phrase "the members of the Management Committee" are the members of the Joint Venture, Daito and Comstock, since those who actually serve on the Management Committee are "representatives" of the members under Section 9.2. and that "a deadlock for purposes of the buy-sell provision can be triggered when *members* are unable to agree, not when *representatives* who the members represent are unable to agree" [Doc. No. 139] at 25. In substance, this position attributes to the word "member" the same meaning as the defined term "Member."

In order to trigger the right to initiate the buy-sell election, Section 12.3(a) requires an inability to agree among the members of the Management Committee, not an inability to decide. A divided vote clearly evidences that "the members of the Management Committee" were unable to agree even though the "members of the Committee" had the ability to make a binding decision. Nor does the word "deadlock" in the title of Section 12.3 change the analysis. The word "deadlock" was not used in Section 12.3(a), only in the title to Section 12.3, and is not an operative term of Section 12.3(a). In addition, Section 1(d) of the Second Amendment, which amended Section 9.2 to provide Comstock with an additional representative on the Management Committee, does not amend Section 12.3(a) or any other aspect of the LLC Agreement. In sum, Comstock's position is particularly difficult to accept given (1) the unchanged text of Section 12.3(a) as a result of an increase in the membership of the Management Committee effected through another contract provisions well as (2) the importance of the right Comstock claims has been abrogated essentially by implication and (3) both parties' acknowledgment that Daito's rights under Section 12.3(a) were not discussed or mentioned during or at the time of the Second Amendment. *See* [Doc. No. 105] at 18, 24; [Doc. No. 144] at 13. Moreover, the parole evidence pertaining to this issue supports Daito's view that the increase in the Management Committee was never intended to affect its rights under Section 12.3(a). *See* [Doc. No. 132-54] (Comstock's in-house counsel not disputing or otherwise replying to Daito's September 2019 email seeking to confirm that its rights under Section 12.3 were unaffected by the Second Amendment).

For the above reasons, no matter how the word "member" in the phrase "members of the Management Committee" is interpreted, Daito retained its rights under Section 12.3(a) even after Comstock obtained a majority on the management Committee. Comstock's request for a

declaration that Daito has lost its rights to initiate a buy-sell election under Section 12.3(a) is therefore denied; and Count II of Comstock's counterclaim is dismissed.

## IV. CONCLUSION

For the above reasons, it is hereby:

**ORDERED** that Daito's Motion for Summary Judgment [Doc. No. 104] be, and the same hereby is, **GRANTED** as to Counts I and II and **DENIED** as to Counts III and IV**,** and it is further

**ORDERED** that Defendants' Motion for Summary Judgment [Doc. No. 110] be, and the same hereby is, **GRANTED IN PART** and **DENIED in part** as to Count I of the Amended Counterclaim, as declared herein**,** and **DENIED** as to Count II; and it is further

**ORDERED** and **DECLARED** that:

(1) Daito's challenge to the First (1x) Dilution under Section 5.2(e) is time barred and that dilution remains operative.

(2) Daito's ownership interest was not properly diluted pursuant to the Second (2x) Dilution under Section 15.20(b);

(3) Daito's ownership interest may be properly diluted by 1.5x under Section 15.20(a);

(4) Comstock's withholding of distributions from Daito pursuant to Section 6.2(a) is proper;

(5) Daito retains its rights to initiate a buy-sell election under Section 12.3(a) in the event that Daito and Comstock are unable to agree on matters set forth therein.

The Clerk is Directed to forward copies of this order to all counsel of record, and to enter judgment pursuant to Rule 58.

Anthony J. Trenga
Senior U.S. District Judge

September 30, 2026
Alexandria, Virginia